# JACKSON, APRIL TERM, 1855.

ROBERT J. McKINNEY,
ROBERT L. CARUTHERS,   } *Judges.*
ARCHIBALD W. O. TOTTEN,

---

THE MAYOR & ALDERMEN OF THE TOWN OF SOUTH MEMPHIS.
v. WARDLOW HOWARD AND JOSEPH KENT, Jr.*

DEDICATION. *Evidence of.*

1. What evidence is sufficient to support a dedication of private property to public use.

   RES JUDICATA. *Decree will not bar subsequent suit, when.*

2. A citizen of Pennsylvania, and a citizen of Shelby County, Tennessee, united in a bill in behalf of themselves and the inhabitants of the town of Memphis to have a certain tract of land lying a half mile from the limits of Memphis, declared public property. They owned lands adjacent to the lot in question; but it did not appear that they had any community of interest with the inhabitants of the town of Memphis. There was a decree for the private claimants, dismissing their bill. *Held,* that this did not bar a subsequent adjudication of the same subject at the suit of other parties, not being these complainants.

This was an injunction bill filed in the Chancery Side of the Common Law and Chancery Court of Memphis, by the Mayor and Aldermen of the Town of South Memphis, claiming as public ground a parcel of land lying adjacent to the Mississippi river and West of Clinton Street, and extending south from Union Street to Beale Street, in what was then the town of South

*For Lithograph illustrating this case see exhibit A. in front of this volume. For notes, see end of case.

98

Memphis, on a portion of which the defendant had erected a cotton shed, which erection the bill sought to have removed as a nuisance. The value of the property in controversy was estimated at $200,000.

Prior to the location of the town of Memphis, John Overton, Andrew Jackson, James and William Winchester by a tripartite deed entered into in the year 1819, after stating that they were owners of a 5,000 acre tract of land granted to John Rice, agreed that they would lay off a town upon the land. In their deed, they set apart as a Town Reserve all that portion of the John Rice grant South of Wolf river and one mile east of the Mississippi river, the deed further describing the said grant as lying on the Mississippi, at the fourth Chickasaw Bluff. In conformity with the recitals in the deed, a survey was made of that all portion of the said grant extending from the mouth of Wolf river to Union street, and extending east to the first alley east of what is now called Third street, but not then named, and the lots were numbered from Sycamore street (which intersected the Mississippi river at the mouth of Wolf,) to Union street, and east as far back as the first alley east of Second street; and Auction, Market, Court and Exchange squares, with streets, were denoted upon the map by open spaces with the words written upon them. From Sycamore to Jackson street, and between Chickasaw street and the Bluff, is a tier of lots marked off and numbered; and between them and the river Mississippi is a space of ground lying just above and below the mouth of Wolf, designated upon the map as "Public Landing." Between Jackson street and Union street, and immediately fronting the lots laid off, is a street or passway 100

On the 20th of April, 1829, the proprietors of the feet wide, called Mississippi Row. Between Mississippi Row and the Bluff, extending from Jackson street to Union street, and varying in width, is an open space marked upon the map as "Public Promenade." Between the space marked as, Public Promenade, and the waters edge is a space of ground with dotted lines and marked as "Chickasaw Bluff;" which spaces, open squares, streets, alleys and lots show the whole of the ground from the mouth of Wolf river to Union street, and from the river Mississippi east to the first alley east of Second street, surveyed, named, numbered and appropriated.

The map from which the above facts appear, seems to have been used in 1820, and since, by the proprietor and others, buying and selling lots in the town of Memphis.

The balance of the 5000 acre tract included in the boundaries of the deed of 1819, from the mouth of Wolf river to the southern boundary of the grant, and one mile east of the Mississippi, was known among the proprietors and public as Town Reserve, embracing about 1300 acres. On the 5th of December, 1822, there was a division among the proprietors of all the land east of and outside of the Town Reserve and Town proper, which was an appropriation of the whole tract or grant of 5000 acres; leaving the Town and Town Reserve alone as joint property among the original proprietors. In September, 1828, a deed was made between the proprietors, Overton, McLemore and the Winchesters, (Jackson having sold out his interest to McLemore in the year 1824,) by which they explain the objects and purposes of the dedication of street, alleys,

squares, promenade, &c., made by the map of 1820, and subsequent surveys and sales.

On the 20th of April, 1829, the proprietors of the Town of Memphis and the Town Reserve, petitioned the Court of Pleas and Quarter Sessions of Shelby County, Tennessee, to appoint commissioners to divide between them their undivided interests in the town lots and in a tract of land of 1200 acres, agreeably to a plat which would be exhibited to them, according to their respective shares to wit: John Overton, one half; John C. Mc-Lemore, one eighth; the heirs of General James Winchester, one fourth, and the devisees of William Winchester, one eighth. Upon which petition the Court appointed A. B. Carr, Nathaniel Anderson, John Ralston, David Dunn, Tilman Bettis, James H. Lawrence, and William Lawrence as such commissioners; all of whom acted except Nathaniel Anderson, and Davied Dunn. By their report it appears that all the undivided lots and parts of lots were divided among the proprietors, after the whole had been laid off in the Town Reserve; and the ground between Union street and the southern boundary line of the grant, now Beal street, and between lots 488, 489, 490, &c., and the river, a portion of which is now in controversy, being left upon the map as an open space without name or designation.

The commissioners, in their report say that they have divided *all* the unsold lots in the Town of Memphis, and their shares or portion of a tract of land lying north, east and south of said Town, usually called and known as Town Reserve, upon the plan furnished by William Lawrence and Marcus B. Winchester, agents for the proprietors."

In the notes and referances upon the map filed by the commissioners as part of their report, is this expression: "By direction, the commissioners have left a passway between the lots and the Mississippi below the mouth of Wolf river, but the fee simple in the soil, and all other rights belonging thereto, are left as they were held before this division; the right of ferrying, particularly across Wolf and the Mississippi rivers, is left in common with said proprietors as they heretofore held it."

From the petition of the proprietors and the report of the commissioners, it appears that the Town Reserve had been surveyed off, and the plan furnished the commissioners, and that their allotments were made from the plan thus furnished.

There had been a former decree in reference to the property in controversy, rendered in the Chancery Court at Somerville, in the year 1843, against the public and in favor of the proprietary owners. But this decree was obtained at the suit of George A. McCall, a citizen of Pennsylvnia and Thomas B. Haralson, a citizen of Shelby County Tennnesee, who filed the bill in behalf of themselves and the inhabitants of the the town of Memphis. But it appears that they were not residents of Memphis, and had no community of interest with the inhabitants of Memphis, and that the property in controversy was a half mile outside of the then limits of Memphis. But the complainants in that suit owned property contiguous to the ground in controversy.

It was proven in behalf of the complainants,

1. That in 1829, the proprietors of Memphis, then owning in common a tract of land, adjacent to the town plat of the town of Memphis, including a parcel adjacent to

the Mississippi river, extending south from Union street as far as the south line of the John Rice grant, made and exhibited a plan for partition on which the ground in question was left open, apparently as public ground, and petitioned the Court of Pleas and Quarter Sessions for a partition. Commissioners for partition were appointed, who returned to the Court with their report, this plan with these notes endorsed upon it as before stated.

" By directions the Commissioners have left a passway between the lots and the bank of the Mississippi river below the mouth of Wolf; but the fee simple in the soil and all other rights belonging thereto, are left as they were held before this division; the right of ferrying, particularly, across the Wolf and Mississippi rivers is left in common with said proprietors as they heretofore held it." This plan with these notes was spread upon the records of the Court of Pleas and Quarter Sessions.

Subsequently McLemore, one of the proprietors, exhibited a copy of this plan, endorsed as correct by Judge Overton, who was one of the largest proprietors.

2. That at a public sale in 1829, made according to said partition, of the property apportioned therein, to one of the parties, L. Henderson bought Lot No. 490, supposing it to front westward on public ground, (the ground in controversy). That N. Anderson, the crier at the sale, offered it as such, being virtually authorized so to do by William Lawrence, the agent of some of the proprietors of Memphis, who was also a surveyor for the proprietors. On account of this representation, Henderson paid more for the lot then he would otherwise have done.

3. That the Memphis Hospital was afterwards built on

this same lot (No. 490,) in order that it might have free access to the Mississippi river over public ground.

4. That parties bought other lots adjacent, paying higher prices, because supposing the tract in question to be public, but in some cases having notice of private claim.

5. That in June, 1841, the heirs of Winchester, one of the proprietors, filed a bill for partition of the land lying adjacent to the lot in controversy, which had descended to them from their ancestor. In this bill they did not claim the lot in controversy as private ground. It also appeared that in 1835, McLemore, one of the proprietors, made a deed of an adjacent lot, in which he made no reference to the ground in controversy as private.

6. That from 1829 to 1855, this ground was not assessed for state and county taxes, except once, in 1848, and then it was sold for non-payment of taxes, and bid in for the proprietors.

7. That the public had during this time and previously, largely used this ground, although it had also been occupied to some extent by private parties.

8. That the public reputation as to this ground had been divided, many esteeming it public ground, while others always thought otherwise.

It was proven in behalf of the defendants,

1. That the partition of 1829, was intended only as a partial one, not to reach to the river, but reserving this parcel from the partition; that the surveyor, Lawrence, was instructed accordingly, and that the plan was made only for private use.

2. That the proprietors did not intend to dedicate this parcel, but intended the contrary.

3. That the surveyor made no calls toward this parcel

as public ground, and none such appear in the County Court record.

4. That private parties had frequently occupied it, and that the proprietors had openly done so.

5. That wharf-boats had for years lain in front of, and attached to it, under permission from the proprietors.

6. That in 1838, a chancery suit had been instituted at Somerville against the proprietors by owners of adjacent lots, seeking to have this parcel declared public grounds, which suit in 1844 was decided in favor of the proprietors, and adversely to the public.

7. That defendants Howard and Kent *deraigu* little through two of the successful defendants in the Somerville. suit.

8. That after the termination of that suit, the proprietors and their assigns spent $13,000 in grading this property as private, and for the purpose of sale.

9. That it was then surveyed into lots by the proprietors, and that these lots were sold at public sale in 1847, as private property, at which sale the then Mayor, and some of the then Aldermen of South Memphis bought lots.

10. That the Complainant, the Town of South Memphis, had a map of the town made, which hung in the Mayor's office and was constantly used, on which this ground was shown so divided into lots.

11. That the Corporation of South Memphis taxed it as private property in 1847, 1848 and 1849, and collected taxes.

12. That the Complainant, the Corporation of South Memphis, had ordered the private owners of this property to lay down sidewalks in front of it.

13. That the Complainants had asked Major Winchester,

one of the proprietors, for permission to use sand from it.

14. That they had also taken steps to buy the same for public use.

15. That parties in South Memphis had urged the defendant Howard to buy this land and build on it.

16. That the defendant acceded, and applied to the Corporation for the grade of Clinton street, so that he could build the shed complained of, which grade the town engineer gave him.

17. That all the present adjacent owners had purchased. with notice of the claims of private right in the premises

18. And by the depositions of ten or fifteen winesses-mostly leading citizens, that they had always regarded and understood it to be private property.

The decree of the Chancery Court was in favor of the public, supporting the dedication of 1829, and compelling the defendants to remove their improvements.

The defendants appealed to the Supreme Court.

GEORGE DIXON for the Complainants :

In the investigation of this cause, there are two material questions presented for the consideration of the Court.

The first, was there a dedication of the ground to, or an easement issuing out of it to the public ?

Second, if there was a dedication, has that dedication been lost or forfeited ?

Of each in their order.

A dedication of land to the public use, may be done in any manner whereby the assent of the owner and the use of the public are united ; or rather, a donation upon the one part and an acceptance upon the other.

The public may also acquire a right to an easement of a

street, promenade or highway by prescription; so the owner of land may make a dedication of it to the public by his own acts without the user of the public, and even without their positive assent,—the law presuming the assent, as in cases of private grantees, until their dissent is manifested If the public use land for a street or public highway with the assent of the owner, it is a dedication to the public. 6 Peters, 440.

If an individual lays off a city or town upon a map, with streets, alleys, public landings, promenades, &c., and sells lots upon the plan thus laid out and exhibited, the spaces thus laid off as streets, alleys, public landings, promenades &c., are immediately dedicated to the public, although there may be an absence of written words or figures, denoting the purposes for which the open spaces were intended. The absence of such words do not in the least diminish the authority of the dedication,—the law not requiring that words should be upon the plan or map of the town expressing the objects and purposes of the different divisions appearing on its face. Such words could not operate as grants *per se*, but only go to explain the map. 8 B. Monroe, 245, 246.

If a town be laid off on the bank of a navigable river, it will be held sufficient evidence of its extending to the water, unless a contrary intention is signified or manifestly indicated; the presumption being, that the town is located upon the river for commercial advantages,—and to presume otherwise than that it extended to the water's edge, would be to defeat the objects, or one of the great objects, of its location. 8 B. Monroe, 240.

That the division of 1829 was for a town, or rather for an extension southward down the Mississippi river of the

town of Memphis, in accordance with the original intention of the proprietors expressed in their deed of 1819, cannot upon the evidence be doubted for a moment.

If an owner of the soil throws open a passage, and neither marks by any visible sign or distinction that he means to preserve all his rights over it, nor excludes persons from passing through it by *positive prohibition*, he shall be presumed to have dedicated it to the public. 6 Peters, 440 ; 1 Campbell, 226.

In this case there was not only a passway thrown open to the public ; but the whole ground was open to the public from 1829 to 1836, when Winchester built his cotton shed ; and highways have been built upon it by the public, and portions of it have ever since been used as a highway and passway.

If a town is laid off on the bank of a navigable river and no appropriation made of an open space between the lots laid off and the river, the portion thus left the law intends for public use ; because the object of laying off a town upon a navigable stream is to afford facilities for commerce; and it would be almost as reasonable to sell and appropriate as private property the river itself, as the ground lining its margin,—the exclusion or shutting up of which would obstruct the communication between the city and the river. The object of locating a town upon a river is to enjoy the benefit of its facilities as a highway, to secure at all times and under all circumstances, a free access to the river, and an undisturbed right to the common use of its banks. 8 B. Monroe, 241, 242.

After a sale of lots made under such dedication, it can neither be revoked nor limited in its extent ; the proprietors will have lost all power over the subject, and the only

power of the Court is, to ascertain and establish the fact and extent of the dedication.   8 B. Monroe, 246, 247.

It is in proof in the record that sales of adjacent lots were made, and titles acquired with reference to the ground in controversy, as public property.

I think that the proof of dedication is overwhelmingly conclusive :

1. From the petition of the proprietors to the Court of Pleas and Quarter Sessions, the report of the commissioners upon the plan furnished, including the notes and references upon the map, together with the deed of the proprietors of July 7, 1832, by which the division and everything therewith connected, are confirmed by all the proprietors.

2. From the abandonment of any claim to the ground in controversy by the heirs of James Winchester, when they file a bill for a division of their interests, and of the devisees of William Winchester, who file their bill for a division in June, 1841, in neither of which cases is any claim set up to the ground in controversy as private property.

3. From the deed of J. C. McLemore, one of the proprietors of June 1st, 1835, to B. H. Martin for Lot No. 489, immediately east of the property in dispute, in which he makes no reference to it as private, but virtually admits it to be public ground.

4. From the admissions and declarations of W. Lawrence the agent and attorney in fact of two of the proprietors owning five-eighths, and surveyor of the ground, that this was public ground, by whose declarations persons were induced to buy property contiguous to, and belonging, to the original proprietors.

5. From the abandonment of all claims to the ground as

proprietary property from the year 1829 up to 1847, as appears by the assessor's book for those years, and the failure to pay the tax.

6. From the fact of the land in controversy having been used as a public passway from 1829 to 1836, without any obstruction or serious claim set up to it, and a continued use by the public, with but slight obstructions up to the time of filing the bill.

7. From the written admissions of John Overton on the map where the dedication is manifest, over his own hand, that the map was correct in June, 1830, after all the facts had come to his knowledge or under his observation.

If ground has once been set apart, and private rights acquired with reference to it, the law looks upon such dedication to the public, in the nature of an estoppel *in pais*, which precludes the original owner from revoking it, having held out inducements to the public to purchase property, by presenting a map with open spaces representing public ground for the enjoyment of the property they have purchased, and making declarations which induce the purchase of contiguous property at higher rates, it would be a violation of good faith to the public, and to those who acquired private property with a view to the use thus publicly granted.

The validity of the dedication does not depend upon a person in being capable of taking it; the party making the dedication will be precluded from reasserting any claim or right to the land so long as it remains in public use, although there may never arise any grantee capable of taking. Appropriations of this kind are like the dedication of highways to the public. 6 Peters, 436, 437, 438; 10 Peters, 712.

Where the owners of urban property have laid it out into lots with streets and avenues intersecting the same, and sold their lots with reference to such a plat, it is too late for them to resume a general and unlimited control over the property thus dedicated to the public as streets, so as to deprive their grantees of the benefits they may acquire by having their streets kept open.    And this principle is equally applicable to the case of a similar dedication of lands in a city or village, to be used as an open square or public walk.    4 Paige Ch. R. 513.

If a man builds a row of houses on either side of a strip of ground, making it a street, and sells or lets a house thereon, it is instantly a dedication as a public highway. 8 Wendell, 105.

The simple act of throwing open the ground to public use is sufficient to create a dedication.    20 Wendell, 121; Smith's Leading cases, 140 ; 3 Vermon, 521, 527.

The use of the ground with the acquiescence of the owner for six or seven years, raises a presumption of a dedication.    9 Yerg. 390 ; 2 Humph. 563.

A much shorter period of possession will suffice to indicate a right in the public, than to show that a private individual has a right to the estate in his possession.    2 Humph. 544 ; 2 Smith's Leading Cases, 94 ; 11 East, 375 ; 9 Yerger, 390.

If one owning ground exhibit a map of it on which a street is defined, though not yet opened, and building lots are sold by him with reference to a front or rear on that street, this is an *immediate dedication* of that street and the purchasers of such lots have a right to have it thrown open forever.    2 Smith's Leading Cases, 139 ; 11

Wendell, 487 ; 8 Wendell, 85 ; 1 Hill N. Y. Rep.    189 ;
3 Kent Com. 450.

If it be dedicated as public ground, it need not be open-
ed or used ; and if unopened or unimproved, that  does  not
affect the public right.    6 Peters, 505, 506 ; 8 B. Monroe,
232.

When a dedication is made, it does not require a  subse-
quent user to establish it.    8 B. Monroe, 250.

Whatever may have been the owner's  real  intention,  if
his conduct is at variance with his purpose, he cannot after-
wards contest the right of the public, who  have  embarked
in projects and formed expectations upon the strength of the
appearances held out to them,  which  it would be  ruinous
to disappoint.    2 Smith's Leading Cases, 139, 140, note ;
20 Wendell, 121, 122.

I now approach the  second  division of  this   discussion,
"If there was a dedication of  the lot in controversy  to the
public, has that dedication been lost   or  forfeited  by  the
public ?"

In the discussion of this division, I shall maintain :

1. That a dedication or grant made to  the  public   can
never be lost, whether corporeal or incorporeal.

2. That although the dedication may have been lost  un-
der other circumstances than those proved  in   this  cause,
the parties  claiming here  are placed in the   capacity   of
trustees, and the statute of limitations cannot enure to their
benefit.

3. That the defendants have failed to make out  such  a
case as would entitle them to hold the property, even though
the statute of limitations would apply.

Before I proceed to discuss these questions, I  will  state
to the Court in the words of Lord Coke, (11th   volume  of

South Memphis v. Howard and Kent.

his reports, page 73,) the rule which by the common law guided the Judges upon all matters wherein tne public is a party on the one hand, and individuals are parties on the ᵥther : which rule is entirely consonant with the best interests of society, and one of the ancient landmarks of English jurisprudence, from which it would be unsafe to depart. He says : "The law will never make an interpretation to advance a private and destroy a public right, but always to advance the public, and to prevent every private right. * * * * The office of judges is always to make such construction as to suppress the mischief and advance the remedy, and to suppress subtle inventions and evasions for the continuance of the mischief and the private convenience, and to add force and life to the cure and remedy, according to the true intention of the makers of the act for the public good."

From the history of the cause as already presented to the Court, the ground south of Union street was laid out into lots and streets some time between 1819, and 1829, and perhaps a portion of it 1829 ; and the dedication was effectually made by the report and map of the commissioners in 1829, not to the town or citizens of the town of Memphis as then incorporated, but to the *whole world*, impliedly to be used, managed and controlled for the public use, under whatever corporate jurisdiction it might in future fall. For, as we have seen, the dedication did not depend upon any one in being capable of taking it ; and when, made it precluded the party making it from reasserting any future claim to the land. 8 Peters, 436 ; 2 Peters, 566.

Until the incorporation of the Town of South Memphis in 1846, there was no one in being capable of taking the

TENN. REP.—8.

grant ; and if previous to that time the proprietors who are regarded in law as trustees of the public rights, whilst there was no one in being capable of taking the grant and protecting the public interests, failed to sue all obstructors of the public rights, can that be imputed to the public as *laches*, so as to give the defendants the advantage of their plea of limitation under adverse possession. I think not, aside from the general doctrine that private right or claim must yield to the more general and public good.

The doctrine of *nullum tempus occurrit* being a peculiar characteristic of sovereignty, attaches wherever there is a sovereignty either in fact or in name, and must from the very nature of the case, exist in all governments. That by the common law, the doctrine that no time runs against the king, the sovereign, is so well settled that it is unnecessary to argue it. It has also been settled in the Courts of the United States, and in all the State Courts of that Union, upon a judicial exposition of the statute of limitaions, that no *laches* can be imputed to the Federal or State governments, because no time runs against the king, the sovereignity, that is, against the State or the United Stats. No man shall acquire title to the lands of the United States or of any State by virtue of adverse possession. The government, the sovereignty, the king, are not to be deprived of their rights by the negligence of their agents. In such cases the government is but the agent or trustee, and holds the property for the public use and benefit.

It may be contended that this doctrine of *nullum tempus occurrit* holds only to sovereignty by name. At common law this was perhaps true, because all donations of streets, public passways or highways, were made either

South Memphis v. Howard and Kent.

to the king or immediately vested in him by virtue of the royal prerogative, not for the particular use and benefit of the king, but for the public. And being so vested in the king as trustee for the public good, no man could claim title either by prescription or limitation ; and it was for all practical purposes but a dedication to the public. But in this country, donations, grants and dedications of streets, highways and public walks, are immediately vested in, the public, the corporation or the State, and for the public good, and belong to the whole public, whether there is a person in being capable of taking the grant or not, and more particularly does it become necessary to adhere to the doctrine of *nullum tempus occurrit*, where there is no one in being capable of taking care of the public interest, than where a grant is made to a corporation or a government by name ; for in the last two intances, the right of suing and being sued is tangible,— all the parties may be brought into Court. The whole public being represented by the public authorities, the agents to whom they have intrusted the management and control of their interests, and by judgments and decrees for and against whom they are bound. And although in a donation like the one under discussion, each member of the community has a right to assert his own particular grievance for obstructions to streets or public passways ; yet no one is bound by his acts, and if any were bound but himself, how many of that public are incapable of suing or of being sued ? Infants, persons of unsound mind, *femmes covert*, persons in duress and beyond sea ; all, in fact, who are either physically or legally incompetent to assert their rights,—are they to be deprived of them because one man or ten thousand have no impediment to an assertion of

theirs ? (The Counsel here stated the origin and history of the doctrine of *nullum tempus occurrit regi*, and to show that in the United States, sovereignty, which in Great Britain resides in the King, and which must in every Government reside somewhere, resides in the mass of the people, and has its exponent partly in the State, and partly in the Federal Government. He cited Calhoun on Government, page 190 ; Webster in Luther v. Borden, 7 Howard; and Taney Ch. J. in the same case ; also Story J., in United States v. Hoar, 2 Mason's C. C. Reports ; from which he drew the conclusion "that the people, the State, the nation the world," being sovereign, "no *laches* can be imputed to them," and that "the doctrine of *nullum tempus occurrit* must prevail to its fullest and largest extent where their rights are involved.")

No length of forbearance on the part of the public to prosecute him who obstructs a highway will estop or conclude it from the assertion of its rights. The party committing it continues to be a wrong doer, and the way obstructed continues to be a public way. Where the obstructor of a highway speaks of prescription on his part, or abandonment on the part of the public, he is met by the doctrine, *nullum tempus occurrit*. State v. Elkin, 2 Humph. 544.

The English and American authorities are likewise clear, that no length of time can justify a nuisance, and that buildings which obstruct a public easement are nuisances. Cro. Jac. 446, Case 25.

Twenty years holding of a navagable river is no bar to a public right, although not used for that length of time by the public. 2 Barn. and Ald. 662.

A right of way, however it may have been acquired, is not lost by non user of 20 years. 3 Cruise Dig. 105 Sec.

21; 10 Mass. 183; Comyn'g Dig. Præscription, E. 2, 10; 8 Peters, 725.

Where there has been a King's highway, no length of time during which it may not have been used, will prevent the public from resuming the right if they think proper. Selwyn's N. P. 1362.

The doctrine of streets, alleys, public promenades or squares, all stand upon the same principle, and the rules and reasons of law apply to all alike. 6 Peters, 436, 437, 438; 12 Wheaton, 582; 2 Smith L. C. 143; 4 Paige, 510; 10 Peters, 720.

The proprietors of towns who make donations of streets, public walks, squares &c., are regarded as trustees of the property until there is some person capable of taking it, and they are as much bound to protect and uphold the public rights as the public authorities of a corporation, and have as little right to defeat or impair it. 8 B. Monroe, 238; 1 Yerg. 338.

It is a well settled principle in equity that all persons coming into possession of trust property with notice of the trust, shall be considered as trustees, and bound, with respect to that special property, to the execution of the trust. 1 Peters, 309.

When the trust is once established, length of time is no bar to the trust, and will not, on principles of eternal justice, be admitted to repel relief to the *cestui qui trust.* 6 Wheaton, 498.

Courts will protect the rights of a *cestui qui trust* against any person having notice of the trust, and actual notice need not be shown, but it is enough if the party acts with such a knowledge of the facts and circumstances as ought to put him on inquiry. 12 Johns. 344.

Although the public use may not have served to establish the rights of dedication to the extent of the entire slip in question, it is sufficient to preserve the pre-existing right from any presumption of abandonment or of forfeiture and loss by mere constructive possession or claim against it.  8 B. Monroe, 250.

A trustee cannot by his own act acquire an interest in the trust estate hostile to that of his *cestui qui trust*, or inconsistent with the proper fulfilment of his fiducial duties.   6 Dana, 176 ; 2 Story, Eq. § 1257, 1258.

I have thus endeavored to establish by what I deem good reason and authority that a dedication made to the public cannot be lost ; and if under any circumstances it can be lost, I think I have satisfactorily shown that the parties defendant in this case are placed in the attitude of trustees, and that the law will not permit them to take advantage of that relation to the injury of the public.   But giving them the benefit of the statute of limitations and adverse possession, have they shown such a possession as will avail them under their plea ?   Our statute of limitations is remedial of the English law, and was intended to protect the innocent settler on the wild and unoccupied lands of the State ; and the primary object of passing the act was to encourage immigration to the State and the settlement of the wild lands.   Under this statute the defendants can make no show of claim ; for they set up no evidence of title except the title bond made by M. B. Winchester as agent to Joseph H. Talbott, which the Courts say is not such evidence as will give the party claiming, a right in the land.   2 Tenn. 394, 395 ; 1 Humph. 450.

To make out adverse possession, the defendants must show a substantial enclosure, and an actual occupancy to

South Memphis v. Howard and Kent.

the whole extent of that enclosure, definite, positive, and notorious, for the whole term of seven years. 3 Yerger, 402.(1) Such an occupancy they have not shown in this case.

The defendants have also taken proof to show the acquiescence of the board of Mayor and Aldermen of the town of South Memphis, permitting the grading of the street, the cutting down of the bluff, &c., on the ground in controversy, which from the law and reasons already advanced, amount to nothing. Where an individual acts in ignorance of his rights, he shall not be prejudiced thereby; and this doctrine applies with as much force to corporations as individuals. 10 Peters, 735.

The only question remaining is that made by the answer of the defendants, in which they plead a former decree rendered at Somerville, where they contend the rights of all the parties interested were adjudged. In order that we may more fully understand that portion of the case, I deem it necessary to give a short history. In the year 1838, when the ground in controversy was outside the corporation of Memphis, and at least a half mile from the inhabited part of the town, a bill was filed by George A. McCall, a citizen of Pennsylvania, and Thomas B. Haralson, a citizen of Shelbey County, Tennessee, purporting to be for themselves and the inhabitants of the town of Memphis [McCall and Haralson owning ground outside of Memphis and opposite the the ground in dispute,] claiming it as public property. The suit lingered on the docket until the year 1843, when, without argument, a decree was rendered, dismissing the bill of complainants, and declaring that the public had no rights in the ground. The answer of the defendants sets up this decree as a bar and estoppel to any other suit on the same subject matter.

I take the law to be that judgments and decrees cannot affect the rights of persons who were not parties, to them. 1 Brockenborough, C. C. R. 122 ; 1Washington, 417.

Lord Bacon, whilst Chancellor of England, laid down this rule with regard to decrees, which has been adhered to ever since his time as the rule of Courts of Equity : When causes come to a hearing in Court, no decree bindeth any person who was not served with process, *ad audiendum judicium* according to the course of the Court, or did not appear gratis in Court in person." 2nd. Vol. Bacon's Works, 486, 11th Ord., 1 Starkie, 213; 1 Green Ev. § 524.

Here a bill is filed by two individuals, not members of the community of Memphis, or of the town of Memphis, having no interest in common with the people of that town, other than any citizen of the State or of the United States has filed a bill in the name of the inhabitants of the town of Memphis for land lying out of its corporate jurisdiction, and with which it had nothing more to do than the town of Nashville or any other town of the State ; of which the corporation of Memphis never took cognizance, neither sued nor was sued in its corporate character. It is true that in some instances a few persons of an incorporated company or parish may sue for themselves, and other members of the company or parish ; but in every case there must be a community of interest ; and in some instances even this will not be permitted to prejudice the interests of those whose names one not used in the suit.

What community of interest was there between George A. McCall, a citizen of Pensylvania, and Thomas B. Haralson, a citizen of Shelby County, Tennessee and the corporation of Memphis, any more than there was between them and the

city of Philadelphia or Pittsburgh? They did not claim to be citizens of Memphis, nor did the corporation of Memphis claim jurisdiction of the property at the time of the filing of the bill, on the rendition of the decree. Besides they (the inhabitants of Memphis,) were remote from the property, cared nothing about it, and had nothing to do with it, except as individual citizens felt interested like the balance of the public, to whom the property belonged.

The suit at bar is not by the inhabitants of Memphis ; but the Mayor and Alderman of South Memphis, who are a very different community from the inhabitants of Memphis, of the legal existence of which there is neither record nor proof. It was the Mayor and Aldermen of Memphis and without that designation they had no legal existence. Incorporated in that name, they must in that character sue or be sued. In cases where the Government is a party, it is expedient that those who protect and assert the public interest should be made parties. Story Eq. Pleading § 222 ; Mitford, Eq. Pleading, 17, 22, 30, 102, 169.

SYLVESTER BAILEY also for the complainants.

A. WRIGHT and MILTON BROWN for the defendant's.

(I have not been able to procure the briefs of defendants counsel. REPORTER.)

TOTTEN., J., delivered an oral opinion, affirming the decree of the chancellor, and concurring substantially in the grounds assumed by Dixon, for the complainants. McKinney and Caruthers, JJ., concurred. Judge Totten promised to reduce his opinion to writing, in view of the importance of the case, but never found time to do so.

*Decree affirmed.*

. South Memphis v. Howard and Kent.

As to a map or plat as evidence of a dedication, see Ely v. Bates, 5 Wis. 467; Weisbrod v. C. & N. W. R. R. Co., 18 Wis. 35; Weisbrod v. C. & N. W. R. R. Co., 21 Wis. 607. Child v. Chappell, 9 N. Y. 257; 2 Smith's Lead. Cases, 208, 222; Washburn on Easements, 154; Angell on Highways, ₰ 149.

As to user as evidence of a dedication, see Hobbs v. Lowell, 19 Pick 405; Valentine v. Boston, 22 Pick. 75; 22 Texas, 94; 35 N. H. 303 Washburn on Easements, 139, 140; Angell on Highways, ₰ 150.

As to the acts of the proprietor as evidence of a dedication, see 24 Conn. 236. And see Bolus v. Smith Infra and note. (3)

As to the enhanced value of adjacent property, as sufficient consideration for a dedication, see, Cincinnati v. White, 6 Pet. 438; Rowan v. Portland, 8 B. Mon. 246; Bissell v. N. Y. C. R. Rd., 23 N. Y. 66.