731 So.2d 190 (1999)
YUMA PETROLEUM COMPANY
v.
The Honorable Herbert W. THOMPSON, Commissioner of Conservation and Assistant Secretary of Conservation of the State of Louisiana.
Nos. 98-C-1399, 98-C-1410.
Supreme Court of Louisiana.
March 2, 1999.
*191 Winston S. Walker, Crowley, for Respondent in No. 98-C-1399 and Applicant in No. 98-C-1410.
John Y. Pearce, Justin H. Homes, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for Applicant in No. 98-C-1399 and Respondent in No. 98-C-1410.
James B. St.John, Jr., Craig Wyman, Richard M. Lyons, Kyle P. Polozola, New Orleans, for Mid-Continental Oil & Gas of Louisiana (Amicus Curiae).
VICTORY, J.[*]
We granted writs filed by Yuma Petroleum Co. ("Yuma") and the Commissioner of Conservation of the State of Louisiana (the "Commissioner") to consider whether the Commissioner can order Yuma, as the current owner of an oil and gas lease, to pay for remediation of contamination from a pit on their lease or whether the Commissioner must bring in all prior owners of the lease to determine who actually caused the contamination.

FACTS AND PROCEDURAL HISTORY
Yuma acquired an oil, gas and mineral lease in St. Martin Parish from Oil Lift, Inc. ("Oil Lift") by instrument signed November 15, 1990, but effective November 1, 1990. On November 8, 1990, the Louisiana Department of Environmental Quality (the "DEQ") conducted an inspection of the site and discovered unauthorized discharges of oilfield wastes from an improperly closed pit on the lease. As a result, the DEQ issued a compliance order on April 15, 1991, ordering Yuma to cease all discharges, cleanup all materials contaminated as a result of the discharges, prepare and implement a Spill Prevention and Control Plan, and close all pits. The Commissioner also ordered Oil Lift to cease all unauthorized discharges and to file a written report.
Following receipt of the compliance order, Yuma conducted remedial operations on the lease. On July 30, 1993, Yuma requested a public hearing before the Commissioner for the purpose of determining attribution of responsibility between the parties who owned and/or operated the production pit prior to its closure for reimbursement to Yuma for site restoration and remediation costs, past and future.
On October 21, 1993, the Commissioner issued a compliance order to Yuma ordering it to conduct further investigation and to submit a plan to remediate the area.
Yuma disputed the alleged violations and continued to urge the Commissioner to conduct a hearing. By letter dated January 28, 1994, the Commissioner advised Yuma that, although he considered himself to be without authority to grant the relief sought to Yuma, i.e., the allocation of responsibility of all prior lease holders, he recognized Yuma's right to a hearing and suggested that the matter be concluded in the form of a final order if the parties could reach a stipulation as to the facts. *192 After stipulations were entered by the parties, the Commissioner affirmed its prior compliance order, stating that the order was not intended to affect any contractual rights Yuma may have against third parties.
Yuma then filed an action for judicial review with the 19th Judicial District Court seeking to invalidate the Commissioner's compliance orders. The trial court affirmed the decision of the Commissioner by judgment dated April 30, 1996, holding that "Yuma Petroleum Company is the current `owner' and, as such, is responsible for site remediation." Yuma moved for reconsideration or, in the alternative, for issuance of written findings of fact and reasons for judgment on May 10, 1996. By order dated May 28, 1996, the court denied Yuma's motion as untimely. Yuma appealed.
On February 20, 1998, the First Circuit, inter alia, reversed the trial court, holding that the Commissioner prejudiced the rights of Yuma and erred as a matter of law by failing to determine and designate former lease holders as "owners" as defined by La. R.S. 30:3(8) and to allocate the obligation, if any, for remediation between the former owners. Yuma Petroleum Co., v. The Honorable Herbert W. Thompson, Commissioner of Conservation and Assistant Secretary of Conservation of the State of Louisiana, No. 96-CA-1840 (La.App. 1st Cir.2/20/98), 709 So.2d 824. We granted writs filed by Yuma and by the Commissioner.[1]Yuma Petroleum Co. v. The Honorable Herbert W. Thompson, Commissioner of Conservation and Assistant Secretary of Conservation of the State of Louisiana, 98-C-1399, 98-C-1410 (La.7/2/98), 721 So.2d 898.

DISCUSSION
The Commissioner claims that even if Yuma did not cause the contamination on the lease that resulted from improper closure of the pit, he can order Yuma to cleanup the property as the "current owner" of the lease and that the court of appeal erred in requiring him to determine and designate former lease holders as owners responsible for remediation costs. Amicus, the Louisiana Division of the Mid-Continent Oil & Gas Association, argues that the court of appeal's decision overturns long-established authority of the Commissioner to demand that the current operator of record remediate its site and will force the Commissioner to undertake protracted hearings to determine prior operators of record and apportion remediation responsibility. Amicus argues that apportionment of responsibility is a matter of contract law to be handled by the courts. Yuma claims Oil Lift is responsible for the improper closure of the pit and the resultant contamination, that the pit was unusable and abandoned when Yuma acquired the lease, and that Oil Lift is the "responsible party" who the Commissioner must look to for remediation of the site.
In reviewing the Commissioner's decision to order Yuma to remediate the contamination from the improperly closed pit on its lease, we look to La. R.S. 30:12 for the correct standard of review. La. R.S. 30:12 grants the district court the authority to reverse or modify the decision of the Commissioner if substantial rights of the appellants are prejudiced because *193 the Commissioner's findings are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (6) manifestly erroneous in view of the reliable, probative and substantial evidence in the record. La. R.S. 30:12 B(5). We have stated that "the Commissioner's findings of fact are entitled to great weight by a reviewing court and, unless manifestly erroneous or clearly wrong, should not be reversed." Hunt Oil Co. v. Batchelor, 93-3144 (La.10/17/94), 644 So.2d 191, 200 (citing Save Ourselves, Inc. v. Louisiana Environmental Control Comm., 452 So.2d 1152 (La.1984)). "Furthermore, in reviewing the conclusions and exercises of agency discretion by the Commissioner, the reviewing court must apply the arbitrariness test, and the party challenging the Commissioner's decision must make a clear showing that the administrative action was arbitrary and capricious." Id.
The jurisdiction and authority of the Commissioner are set out in La. R.S. 30:4. Under La. R.S. 30:4(A), "[t]he commissioner has jurisdiction and authority over all persons and property necessary to enforce effectively the provisions of the Chapter and all other laws relating to the conservation of oil or gas." In furtherance of that jurisdiction, La. R.S. 30:4(C) provides, in pertinent part:
The commissioner has authority to make, after notice and hearings as provided in this Chapter, any reasonable rules, regulations, and orders that are necessary from time to time in the proper administration and enforcement of this Chapter, including rules, regulations, or orders for the following purposes:
(16)(a) To regulate by rules, the drilling, casing, cementing, disposal interval, monitoring, plugging and permitting of disposal wells which are used to inject waste products in the subsurface and to regulate all surface and storage waste facilities incidental to oil and gas exploration and production, in such a manner as to prevent the escape of such waste product into a fresh groundwater aquifer or into oil or gas strata; may require the plugging of each abandoned well or each well which is of no further use and the closure of associated pits, the removal of equipment, structures, and trash, and other general site cleanup of such abandoned or unused well sites; and may require reasonable bond with security for the performance of the duty to plug each abandoned well or each well which is of no further use and to perform the site cleanup required by this Subparagraph. Only an owner as defined in R.S. 30:3(8) shall be held or deemed responsible for the performance of any actions required by the commissioner.

La. R.S. 30:4(C)(16)(a) (emphasis added).
Prior to its amendment in 1993, La. R.S. 30:3(8) defined "owner" as "the person who has the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." La. R.S. 30:3(8) now reads as follows:
"Owner" means the person, including operators and producers acting on behalf of the person, who has or had the right to drill into and to produce from a pool and to appropriate the production either for himself or for others.
La. R.S. 30:3(8) (emphasis added). The court of appeal found that this amendment "expands the definition of owner and now includes former operators and producers and provides that previous lease holders are to be considered as owners" and that the Commissioner "erred as a matter of law by failing to determine and designate former lease holders as `owners' as defined by statute." Slip Op. at pp. 6-7, 709 So.2d at p. 828. We disagree.
The 1993 amendment to La. R.S. 30:3(8) merely gives the Commissioner the *194 discretion to proceed under La. R.S. 30:4(C)(16)(a) against prior owners in certain circumstances. At oral argument, the Commissioner explained that the amendment was a "Commissioner's bill," drafted to give the Commissioner more discretionary authority to proceed against prior owners, not to encumber the Commissioner with the additional duty of having to ascertain every prior lease holder of a site and to determine which lease holder actually caused the subject contamination.[2] It is well established in the State's oil and gas community that the current "operator of record" of a lease is responsible for remediation on that lease.[3]
In Louisiana, Office of Conservation Statewide Order 29-B, which governs the construction, maintenance, and closure of production and other pits, plainly requires that the lease operator properly close production pits and assure protection of the soil, surface water, and groundwater. See La. Admin. Code 43:XIX.129.-B.2-7.[4] Statewide Order 29-B requires documentation of closure activities to be maintained in the operator's files for three years as follows:
Documentation of testing and closure activities, including onsite disposal of NOW, shall be maintained in the operator's files for at least three (3) years after completion of closure activities. Upon notification, the Office of Conservation may require the operator to furnish these data for verification of proper closure of any pit. If proper onsite closure has not been accomplished, the operator will be required to bring the site into compliance with applicable requirements.
LAC 43:XIX.129.B.6e. Under this order, the Commissioner can require the operator to furnish the data to verify proper pit closure. If he finds proper pit closure was not accomplished, the operator will be required to bring the site into compliance. LAC 43:XIX.129B(B)(6)(e). Thus, Yuma, *195 as the current "operator," is required to bring the pit into compliance, even though the pit was allegedly closed by a prior lessee within the three year period.
Second, long-standing Office of Conservation enforcement policy mandates that existing operators of record shall be primarily responsible for oilfield site remediation. In a memorandum articulating this pre-existing policy entitled Enforcement Policy-Abandoned Wells & Pits, by J. Patrick Batchelor, Commissioner of Conservation, dated July 24, 1990, the Commissioner noted that a prior operator may only be held responsible after a determination that the "operator of record no longer exists (bankruptcy, etc.)." The policy memorandum further noted that if the operator of record no longer exists, the Commissioner "will pursue a line of succession from [the] current operator of record down to [the] original generator" to determine responsibility for remediation. Incidently, this policy memorandum greatly expanded the potential scope of liability beyond the operator of record resulting from contamination from abandoned wells and pits under the Louisiana Abandoned Oilfield Waste Site Law, La. R.S. 30:71, et seq. Louisiana Environmental Handbook, Vol. 2, § 15.9, p. 15-26 (West 1998). Thus, under the "current operator of record" doctrine, and as the "owner," Yuma is responsible for remediation.
Yuma claims that, although the current operator of record doctrine is a viable doctrine, it does not apply here. Yuma argues that the doctrine does not apply because of certain forms previous lessors supplied to the Commissioner regarding closure of the pit. On December 11, 1986, the then owner of the lease, Vernon E. Faulconer, Inc., submitted a Production Pit Notification report on a form provided by the Commissioner. The report shows that the production pit facility was scheduled to be permanently closed by 1989. Thereafter, at the time Oil Lift acquired the lease, a Production Pit Inspection Report was completed and filed reflecting that the pit was closed. The form was not signed by any agents of Oil Lift on the space provided but was signed by a Department of Conservation "Enforcement Agent" on November 16, 1989. The appropriate check-in box is marked representing that the pit and/or the closure was "IN COMPLIANCE." Yuma claims that this constitutes a public record on which it relied in believing that the pit was closed in compliance with any requirements by the Commissioner. Yuma also claims that the Commissioner has a statutory obligation to require Oil Lift to properly close the pit in accordance with the November 16, 1989 Production Pit Inspection Report.
The Commissioner argues that the specifics of proper closure are governed by LAC 43:XIX.129.B.6, not by a Production Pit Inspection Report, which is an internal document prepared solely by the Commissioner for filing within the Commission. The Commissioner further argues that testing of closed pits to ensure proper closure within Statewide Order 29-B parameters is solely the responsibility of the operator. As discussed earlier, under LAC 43:XIX.129.B.6e, it is clearly the duty of the current operator of the site to maintain documentation of testing and closure activities for three years after the closure, even if a prior operator conducted the closure. If the Commissioner discovers that the pit was not closed in compliance with Statewide Order 29-B, the current operator will be required to bring the pit into compliance. In light of this requirement and the well known policy of the Commissioner to proceed against the current owner of record, we agree with the Commissioner's position. When Yuma acquired its interest it should have obtained these records from its transferor or found out whether such records existed. By not doing so, Yuma would not have been prepared to furnish this data for three years after the "purported" November 16, 1989 closure to the Office of Conservation as required by rule. In addition, Yuma would not know whether the test results *196 showed that the closure was actually accomplished in compliance with the rules.
Yuma also argues that the current operator of record does not apply because the Oilfield Site Restoration Law, La. R.S. 30:80 et seq., governs this case. Yuma argues that under the Oilfield Site Restoration Law, the "responsible party," not the current operator of record, is responsible for cleanup. Under La.R.S. 30:89(A), the "responsible party" is defined as follows:
the operator of record according to the office of conservation records, who last operated the property on which the oilfield site is located at the time the site is about to be abandoned, ceases operation, or becomes an unusable oilfield site, and that operator's partners and working interest owners of that oilfield site.
La. R.S. 30:82(9). Yuma argues that the pit is the "oilfield site" and that at the time the pit was "about to be abandoned, cease[d] operation, or bec[ame] an unusable oilfield site," Oil Lift was the operator of record. Therefore, Oil Lift, not Yuma, is responsible for remediation.
Yuma's argument fails because that law does not apply here. The Louisiana Oilfield Site Restoration Law was enacted in 1993, the same year in which the definition of "owner" in La. R.S. 30:3(8) was expanded to also include persons who had the right to drill. When this law was presented to the House Committee on Natural Resources in the form of House Bill 2038, John Ales, who presented the bill on behalf of the Department of Natural Resources, explained that the bill "makes no changes in the liability or increases the liability of anyone involved in the operation of an oilfield site or lease." He further stated that "the proposed law provides a mechanism for making sure that when the lease or the production expires there are sufficient funds available for cleanup." When he explained the bill to the Senate Committee on Environment, Mr. Ales explained that the bill "sets up two types of funds to cleanup abandoned oilfield sites. There are approximately 2,000 sites in Louisiana that are abandoned sites. We can't find anyone who is responsible to cleanup the abandoned sites."
Specifically, the law provides for site-specific trust funds to be set up by parties to a transfer of property if they so desire, and for a statewide Oilfield Site Restoration Fund to which operators contribute. For example, site restoration of a nonorphaned "unusable" oilfield site[5] can be paid for from a site-specific trust account[6] only after the assistant secretary certifies that the "responsible party" for that site has failed to undertake restoration of the site. La. R.S. 30:89(A).[7] The Commissioner can declare a site "orphaned" upon a finding that the site was not closed pursuant to statutory and regulatory requirements, or the site constitutes a danger or *197 potential danger to the public health, the environment or an oil and gas formation and there is no responsible party who can be located or such party has failed or is financially unable to restore the site. If a site is orphaned, cleanup can be paid for out of the Oilfield Site Restoration Fund. The Commissioner need not look to the Oilfield Site Restoration Law in this case because there exists a current and locatable financially able "owner."

CONCLUSION
The Commissioner's decision to proceed against Yuma as the "owner" under La. R.S. 30:3(8) and 30:4 C(16)(a) is accorded great weight and Yuma has not made a clear showing that the administrative action was arbitrary and capricious. In fact, the Commissioner's decision to proceed solely against Yuma as the current owner is in accordance with statutory law and its long-standing well-known policy. Contrary to the court of appeal's ruling, although the Commissioner has the discretion to proceed against prior owners under 30:3(8), it is not required to proceed against prior owners, especially where a current owner exists. This is not to say that one or more prior owners may not be liable to Yuma for remediation costs, but this is a matter of contract law which is beyond the jurisdiction of the Commissioner. Magnolia Coal Terminal v. Phillips Oil Co., 576 So.2d 475 (La.1991).

DECREE
For the reasons stated herein, the holding of the court of appeal that the Commissioner erred as a matter of law by failing to determine and designate former lease holders as "owners" and remanding the case to the Commissioner to identify former lease holders and allot responsibility for remediation between the former owners is reversed. In all other respects, the decision of the court of appeal is affirmed.
REVERSED IN PART; AFFIRMED IN PART.
LEMMON, J., concurs.
NOTES
[*] Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[1] Yuma raises other issues, such as that the court of appeal erred in failing to conclude that the Commissioner violated Yuma's right to due process by refusing to conduct a hearing concerning its orders requiring Yuma to remediate the subject lands. In granting the application for certiorari on the issue of whether the Commissioner can order Yuma, as the current owner, to pay for the remediation, or whether the Commissioner must bring in all prior owners to determine who actually caused the contamination, we did not intend to address these other issues. Therefore, we will recall the writ as to these other issues and deny the application insofar as it pertains to these other issues. See Bryan v. City of New Orleans, 98-1263 (La.1/20/99), ___ So.2d ___, 1999 WL 20940; Ruiz v. Oniate, 97-2412 (La.5/19/98), 713 So.2d 442, 449; Sanders v. Zeagler, 96-1170 (La.1/14/97), 686 So.2d 819; Ledbetter v. Concord General Corp., 95-0809 (La.1/6/96); 665 So.2d 1166.
[2] A review of the legislative history shows that Herb Thompson, Commissioner of the Department of Natural Resources, testified before the House Committee on Natural Resources and provided information on the bill and stated that the definition would include operators and producers and eliminated the land owner as a potentially liable party.
[3] The current "operator of record" doctrine is somewhat analogous to the "operator liability doctrine" under federal law. As it was explained in a slightly different context, "the operator liability doctrine permits the [Department of Energy] to hold an operator liable for the full amount of any overcharges attributable to sales from a particular property without regard to whether the operator itself received the overcharges." In re Department of Energy Stripper Well Exemption Litigation, 90 F.3d 1551, 1555 (Fed.Cir.1996). "Operator liability has been imposed in at least two general situations: when the operator is the animating force responsible for the overcharges, or when the operator is held liable as a matter of administrative convenience." Id. (citing In re Department of Energy Stripper Well Exemption Litig., 968 F.2d 27, 33 (Temp.Emer.Ct.App.1992) (holding that the doctrine is devised primarily for the administrative convenience of the Department of Energy) and United States v. Exxon Corp., 561 F.Supp. 816, 850 (D.D.C.1983) (requiring the Department of Energy to proceed against over 200 working interest owners and over 2200 royalty interest owners would plunge the agency into an "administrative quagmire"), aff'd, 773 F.2d 1240 (Temp.Emer.Ct.App.1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986)).
[4] For example, the Order (1) requires that operators comply with several pit maintenance requirements, whether those pits are to be utilized or not; (2) requires operators to restrict the placing of produced water and other waste into reserve pits; (3) directs operators with unlined emergency pits to submit written justification to the Commissioner; (4) discusses corrective action and closure requirements that the Commissioner may impose upon an operator; (5) requires the operator to immediately notify the Office of Conservation of contamination or discharges from a pit; (6) makes clear that liability for pit closure shall not be transferred from an operator to the owner of the surface on which the pit is located; and (7) requires an operator to furnish data to verify proper pit closure or otherwise be required to bring the site into compliance with applicable requirements.
[5] An "unusable oilfield site" means an oilfield site which has no continued useful purpose for the exploration, production, or development of oil or gas and for which a responsible party can be located. La. R.S. 30:82(12).
[6] A "site specific trust account" may be established if an oilfield site is transferred from one party to another to separately account for each site for the purpose of providing a source of funds for site restoration of that oilfield site at such time in the future when restoration of that oilfield site is required. La. R.S. 30:88(A).
[7] The Oilfield Site Restoration Law further states that where a site specific trust account has been approved and property transferred, all prior owners, operators and working interest owners shall not thereafter be held liable. La. R.S. 30:88(F). If funds from the site specific trust account are depleted, the secretary can order the responsible party to pay for the remainder of the cleanup. If he fails to do so and if there is no site specific trust account, the secretary shall declare the site to be orphaned. La. R.S. 30:89. A site may be declared orphaned if no responsible party can be located, or such party has failed or is financially unable to remediate the property and the site was not properly closed. If a site is declared orphaned, the secretary shall not be authorized to recover restoration costs from former operators unless restoration costs exceed $200,000.00.