68 So.3d 609 (2011)
SIX C PROPERTIES, LLC
v.
James H. WELSH, Commissioner of Conservation of the State of Louisiana Office of Conservation and Radius Operating, LLC.
No. 2010 CA 1913.
Court of Appeal of Louisiana, First Circuit.
May 26, 2011.
*610 William Timothy Allen, III, Michael E. Riddick, Paul M. Adkins, Stacey D. Williams, Shreveport, LA, for Plaintiff/Appellant Six C Properties, LLC.
J. Blake Canfield, Baton Rouge, LA, for Defendant/Appellee James H. Welsh, as Commissioner of Conservation.
Randall C. Songy, Karen D. Ancelet, Lafayette, LA, for Defendant/Appellee Radius Operating, LLC.
Before PARRO, GUIDRY, and HUGHES, JJ.
GUIDRY, J.
Six C Properties, LLC (Six C), the surface owner of a substantial portion of land subject to a coal seam natural gas (CSNG) unit established by order of the Commissioner of Conservation, appeals a district court judgment upholding the order.

FACTS AND PROCEDURAL HISTORY
In October 2009, Radius Operating, LLC (Radius) filed an application with James H. Welsh, Commissioner of Conservation (Commissioner) to hold a public hearing regarding the issuance of an order to create a CSNG unit[1] in the Middle and *611 Lower Wilcox Coal Seam Zone of the East Bayou Castor Field in LaSalle Parish, for the exploration and production of CSNG. Radius defined the area of the unit to be created as "that coal seam natural gas bearing zone encountered between the depths of 2,650 feet and 3,825 feet, electrical log measurements, in the Radius Operating, LLC  LP Mineral Owners et al No. 1 Well, located in Section 28, Township 11 North, Range 2 East, LaSalle Parish, Louisiana, less and except all non-coal intervals encountered within such zone."
On November 17, 2009, the Commissioner conducted a public hearing in accordance with Radius's application and received evidence relative to the establishment of the proposed unit. Six C appeared at the hearing and offered evidence in opposition to the unit proposed by Radius.
On December 7, 2009, the Commissioner issued Office of Conservation Order No. 1528 establishing the rules and regulations for the creation of a CSNG unit for the Middle and Lower Wilcox Coal Seam Zone in the East Bayou Castor Field (hereinafter referred to as the "East Bayou Castor unit"), with Radius as the unit operator. In issuing the order, the Commissioner specifically found the creation of the East Bayou Castor unit was necessary to promote the development of a CSNG producing area, to prevent waste, and to avoid drilling unnecessary wells. The Commissioner further found the available evidence was sufficient to reasonably establish the limits of the CSNG producing area and to establish that operation of the East Bayou Castor unit was economically feasible, so that each separate tract within the unit would be reasonably assured an opportunity to recover its just and equitable share of CSNG. Office of Conservation Order No. 1528 authorized Radius to drill as many wells to serve the unit "as may be necessary to efficiently and economically drain" the CSNG producing area. The order exempted any future wells drilled and completed within the East Bayou Castor unit from any spacing-between-wells requirement, but mandated that no well be located any closer than 330 feet to any unit boundary.
Following the Commissioner's issuance of Office of Conservation Order No. 1528, Six C filed a petition for judicial review in the Nineteenth Judicial District Court, naming the Commissioner and Radius as defendants in that action. In the petition for judicial review, Six C alleged that the Commissioner's issuance of Office of Conservation Order No. 1528 was manifestly erroneous and an abuse of discretion. In lieu of arguments, the case was submitted based solely on the agency record and memoranda filed by the parties. The district court rendered judgment "confirming and upholding" Office of Conservation Order No. 1528 in a judgment signed July 12, 2010. Six C devolutively appeals.

ASSIGNMENTS OF ERROR
On appeal, Six C contends that the district court erred in confirming and upholding the Commissioner's order based on the following specified errors:
The District Court erred by confirming and upholding Office of Conservation Order No. 1528 when the evidence in the record showed that the creation of the coal seam natural gas unit was not economically feasible as required by La. R.S. 30:5.2.

*612 The District Court erred by confirming and upholding Office of Conservation Order No. 1528 when the Commissioner abused his discretion by failing to restrict the number of wells or impose spacing between wells.
The District Court erred by confirming and upholding Office of Conservation Order No. 1528 when the evidence in the record failed to establish the limits of the coal seam natural gas producing area.

DISCUSSION
The standard for the district court's review of the Commissioner's order is found in La. R.S. 30:12, which provides that such review shall be conducted by the court without a jury and confined to the administrative record. La. R.S. 30:12(B)(4). The statute further provides:
The court may affirm the decision of the assistant secretary or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(a) In violation of constitutional or statutory provisions;
(b) In excess of the statutory authority of the agency;
(c) Made upon unlawful procedure;
(d) Affected by other error of law;
(e) Arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(f) Manifestly erroneous in view of the reliable, probative, and, substantial evidence on the whole record. In the application of the rule, where the assistant secretary has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the assistant secretary's determination on credibility issues.
La. R.S. 30:12(B)(5). Thereafter, if a party is dissatisfied with the judgment of the district court following judicial review, the party is free to appeal the judgment to the appropriate appellate court. See La. R.S. 30:12(D) and 30:15. On appeal, the Commissioner's findings of fact are entitled to great weight and, unless manifestly erroneous or clearly wrong, should not be reversed. Hunt Oil Company v. Batchelor, 93-3144, p. 11 (La.10/17/94), 644 So.2d 191, 200. In reviewing the conclusions and exercises of agency discretion by the Commissioner, the reviewing court must apply the arbitrariness test, and the party challenging the Commissioner's decision must make a clear showing that the administrative action was arbitrary and capricious. Yuma Petroleum Company v. Thompson, 98-1399, pp. 4-5 (La.3/2/99), 731 So.2d 190, 193.
In 2004, the Louisiana Legislature enacted La. R.S. 30:5.2 to provide authority for the Commissioner to establish CSNG units "when such unit operation will promote the development of such coal seam natural gas producing area, prevent waste,[[2]] and avoid the drilling of unnecessary *613 wells." La. R.S. 30:5.2(B). According to the statute, an order to create a CSNG unit may only be issued after notice and a public hearing and must be based on findings that: (1) the order is reasonably necessary to promote development of a CSNG producing area and to prevent waste and the drilling of unnecessary wells; (2) the unit operation is economically feasible; and (3) the limits of the CSNG producing area can be reasonably established based on sufficient existing evidence. La. R.S. 30:5.2(C).
In its first specification of error, Six C contends the record does not establish that the East Bayou Castor unit is economically feasible. Salar Nabavian, the president of Radius, testified at the public hearing regarding the economic feasibility of the proposed unitization. In conjunction with his testimony, Radius offered two exhibits prepared by Mr. Nabavian that documented the income he projected would be generated by the East Bayou Castor unit. Mr. Nabavian testified that he is a petroleum engineer with a history of working in various fields of oil and gas exploration. In considering the economic feasibility of the unit, Mr. Nabavian testified that he had a company perform a reservoir study of the project to asses the permeability, porosity, drainage, acreage, and similar features of the project. In light of the study, Mr. Nabavian believed that he could "dewater" the area in a timely fashion to make the project "very economic." He explained that he had expended a lot of the upfront costs to establish two drilling wells and a saltwater well in the unit due in part to some equipment he patented to help dewater the area. Still, Mr. Nabavian testified that "[e]ven at this point, I already had all indication that I needed that there's coal seams in this particular area that had plenty of natural gas and really, it was a function of dewatering."
Mr. Nabavian testified that he used information from another CSNG unit in the area, the Riverton Unit CSNG No. 1, to forecast the production and income figures for the East Bayou Castor unit that he listed in exhibits 6 and 7. Mr. Nabavian said that he chose the Riverton unit because it had the longest production history. Based on the raw data from the Riverton unit and his background in oil and gas drilling operations, Mr. Nabavian opined that the project was economically feasible.
Six C points out that the actual numbers reported by Radius for the initial operation of the two drilling wells and the saltwater well reveal that operating costs are much higher and the production amounts are much lower than those projected by Mr. Nabavian in exhibits 6 and 7. While he acknowledged that as of the date of the public hearing, the project had not attained economic feasibility, Mr. Nabavian testified that he was confident the project would be economically feasible based on his expertise and the existence of other CSNG operations in the area. He stated that the initial operating costs were higher and the production numbers were lower due to the initial phase of the project being a "lessons-learned period." But as he explained about the operating expenses, "there's a reduction as we've learned more and more." He also stated that part of the reason that the project initially lost rather *614 than made a profit was because he "oversized" his facilities. For example, he stated that the project's compressor was too big, "so, in essence it's using quite a bit of that natural gas"; therefore, he said he would downgrade his equipment to be more economical.
While the initial numbers presented by the two wells Radius had begun operating demonstrated that the project was not economically viable at the time of the public hearing, Mr. Nabavian nevertheless testified that many of the costs would decrease and the production would increase as the project was further developed and additional wells were added. Moreover, Mr. Nabavian's testimony established that there were other economically feasible CSNG units operating in the area. By virtue of his regulatory authority, the Commissioner is surely knowledgeable of the success of the other CSNG units referred to by Mr. Nabavian. He also is better suited, by his expertise in the field of minerals management, to assess the credibility of Mr. Nabavian to testify about the economic feasibility of the project. See Amoco Production Company v. Thompson, 516 So.2d 376, 395 (La.App. 1st Cir.1987), writs denied, 520 So.2d 118 (La. 1988). As such, we cannot say that the Commissioner erred in finding the project to be economically feasible.[3]
In its second assignment of error, Six C contends that the Commissioner abused his discretion in not imposing restrictions on the spacing between wells. We disagree. Craig Barclay, a geologist from Shreveport, Louisiana, was hired by Radius to study the area proposed for the East Bayou Castor unit. Mr. Barclay testified on behalf of Radius at the public hearing before the Commissioner. In his testimony, he specifically recommended that project wells not be drilled within 330 feet of a unit boundary, but as for spacing between wells, he recommended that there be no spacing-between-wells restrictions, consistent with what had been approved for other CSNG producing units. He recommended that there be no spacing-between-wells restrictions to maximize the recovery of CSNG, again consistent with other CSNG producing units.
According to La. R.S. 30:9(C), the Commissioner must "consider all available geological and engineering evidence and shall provide for the unit well to be located at the optimum position in the drilling unit for the most efficient and economic drainage of such unit." In this instance, the only scientific evidence presented regarding the optimum position for well spacing was the testimony of Mr. Barclay and exhibits submitted in conjunction with his testimony. Thus, the Commissioner did not abuse his discretion in failing to require spacing between wells in the unit, as the record clearly contains evidence that supports the Commissioner's decision.[4] *615 See also Simmons v. Pure Oil Co., 124 So.2d 161, 165 (La.App. 2d Cir.1960), aff'd, 241 La. 592, 129 So.2d 786 (1961).
Finally, Six C argues that the record fails to establish the limits of the CSNG producing area. We reject this argument. Mr. Barclay expressly testified at the public hearing that the entire area of the proposed unit is reasonably believed to be underlain by coal seams that are productive of natural gas and that because the entire area is underlain by productive CSNG, the boundaries of the unit reasonably establish the limits of the CSNG producing area. Furthermore, we observe that La. R.S. 30:5.2(C)(3) provides that the Commissioner must find that "[s]ufficient evidence exists to reasonably establish the limits of the coal seam natural gas producing area."[5] So although Mr. Barclay testified that the exact boundary of the CSNG producing area would not be known until Radius continued drilling and developing the unit, his testimony, based on his geologic study of the area, is sufficient evidence to reasonably establish the limits to which he testified.

CONCLUSION
Therefore, finding that the record sufficiently supports the Commissioner's issuance of Office of Conservation Order No. 1528, we affirm. All costs of this appeal are assessed to Six C Properties, LLC.
AFFIRMED.
HUGHES, J., dissents in part and assigns reasons.
HUGHES, J., dissenting in part.
I respectfully dissent as to the failure of the Commissioner of Conservation, and this court, to enforce the spacing provisions of La. Admin. Code Title 43, part XIX, Subpart 7, Chapter 19, section 1905 et seq.
I am greatly concerned about the spacing exemption given to Radius. 80% of the proposed unit is commercial forest land owned by Six C. Certain areas involved with well drilling cannot be reforested and other areas are at a greatly increased risk of erosion. Given the serious issues that the Radius project is not, and may not become, economically feasible and the inability thus far to guard against or pay for damages inflicted on the forest lands of Six C, it would seem that the spacing requirements should be strictly enforced rather than exempted, and I respectfully submit that the Commissioner was arbitrary and abused his discretion in this regard.
The uncontradicted testimony of forestry expert Stephen Gleason establishes for the record that Six C has an investment of over $60 million with over 4,000 acres in *616 the proposed unit. Surface lands taken for well sites, roads, and pipelines cannot be reforested, resulting in a loss. There is already considerable erosion occurring and Radius has failed to vegetate as promised. As put by Mr. Gleason, "in that part of the world, erosion is, you know  if you don't have something growing on it, its going to leave there."
Mr. Gleason also pointed out that forestry operations are based on scale, and the more "chopped up" the forest becomes, the greater the difficulty to operate and necessarily the less profitable. Mr. Gleason testified that the failure to enforce normal spacing requirements would be "devastating" to Six C.
The spacing requirements were adopted for a purpose. In this case they beg for enforcement, not exemption. Landowners beware.
NOTES
[1] According to La. R.S. 30:9(B), a drilling unit is "the maximum area which may be efficiently and economically drained by one well. This unit shall constitute a developed area as long as a well is located thereon which is capable of producing oil or gas in paying quantities."
[2] According to La. R.S. 30:3(1), "waste" means

[I]n addition to its ordinary meaning, means "physical waste" as that term is generally understood in the oil and gas industry. It includes:
(a) the inefficient, excessive, or improper use or dissipation of reservoir energy; and the location, spacing, drilling, equipping, operating, or producing of an oil or gas well in a manner which results, or tends to result, in reducing the quantity of oil or gas ultimately recoverable from a pool; and
(b) the inefficient storing of oil; the producing of oil or gas from a pool in excess of transportation or marketing facilities or of reasonable market demand; and the locating, spacing, drilling, equipping, operating, or producing of an oil or gas well in a manner causing, or tending to cause, unnecessary or excessive surface loss or destruction of oil or gas.
(c) The disposal, storage or injection of any waste product in the subsurface by means of a disposal well.
[3] Furthermore, as has been recognized:

[T]he inherent nature and character of the right to extract oil and gas from the soil is such as not to be susceptible of having an intrinsic, determinable, and fixable value. The element which enters into the valuation is too uncertain, conditional, and contingent. At most any value which may be fixed on the right is contemplative, speculative, and conjectural, not to say fanciful and theoretical.
Cascio v. Twin Cities Development, LLC, 45,634, p. 5 (La.App.2d Cir.9/22/10), 48 So.3d 341, 344 (quoting Wilkins v. Nelson, 155 La. 807, 813, 99 So. 607, 609 (1924)).
[4] Also in conjunction with this specification of error. Six C urges that damage to its forestry business is another reason why the failure to impose a spacing-between-wells requirement was an abuse of discretion. Through the testimony of Stephen Gleason, Six C established that 4,640 acres of the 5,600 acres of forestry land that it owns is contained in the East Bayou Castor unit; therefore, Six C proposed a minimum spacing between wells of 2,640 feet to protect its interest as a surface owner. By law, "[t]he owner of land burdened by a mineral right or rights and the owner of a mineral right must exercise their respective rights with reasonable regard for those of the other." La. R.S. 31:11(A); see also La. R.S. 31:22 (providing that "[t]he owner of a mineral servitude ... is entitled to use only so much of the land as is reasonably necessary to conduct his operations. He is obligated, insofar as practicable, to restore the surface to its original condition at the earliest reasonable time."). Thus, to the extent Radius's operations in the East Bayou Castor unit violates these duties, Six C's remedy lies in pursing an action for damages against Radius. See Dupree v. Oil, Gas & Other Minerals, 31,869 (La.App.2d Cir.5/5/99), 731 So.2d 1067; Edwards v. Jeems Bayou Production Company, 507 So.2d 11 (La.App. 2d Cir.1987).
[5] According to finding "2" recited in Office of Conservation Order No. 1528, the Commissioner simply found "that sufficient evidence exists to reasonably establish the limits of the coal seam natural gas producing area."